## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

------------------------------------------------------ X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 08-17646 |
| | : | |
| | : | |
| EQUITY MEDIA HOLDINGS CORP. | : | |
| | : | |
| | : | |
| Debtor. | : | |

------------------------------------------------------ X

### EMERGENCY MOTION FOR ORDER, PURSUANT TO 11 U.S.C. § 1112(b), CONVERTING THIS CASE TO CHAPTER 7 OR DISMISSING THIS CASE OR, ALTERNATIVELY, PURSUANT TO 11 U.S.C. § 362(d), LIFTING AUTOMATIC STAY TO PERMIT EXERCISE OF REMEDIES, OR,  IN FURTHER ALTERNATIVE, <u>PURSUANT TO 11 U.S.C. §1104(a), APPOINTING CHAPTER 11 TRUSTEE</u>

Silver Point Finance, LLC ("<u>Silver Point</u>"), in its capacity as the Administrative Agent and Collateral Agent under that certain Third Amended and Restated Credit Agreement, dated as of February 13, 2008 (as amended and supplemented from time to time, the "<u>Credit Agreement</u>"), by and among Equity Media Holdings Corporation ("<u>EMHC</u>" or the "<u>Debtor</u>") and certain of its subsidiaries, as Borrowers, Silver Point, as Administrative Agent and Collateral Agent, and the lenders party thereto from time to time (together with Silver Point, the "<u>Secured Lenders</u>"), hereby files this emergency motion (the "<u>Motion</u>") [1] for an Order, pursuant to section 1112(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>"), converting this case to chapter 7 or dismissing it outright or, in the alternative, lifting the automatic stay pursuant to section 362(d) of the Bankruptcy Code, to allow the Secured Lenders to exercise remedies available to them under the Credit Agreement and applicable non-bankruptcy law or, in further alternative, pursuant to section 1104(a) of the

---

[1]    Contemporaneously herewith, Silver Point has filed a motion for expedited consideration of the Motion.

Bankruptcy Code, appointing a trustee in this chapter 11 case. In support of the relief requested in the Motion, Silver Point respectfully states as follows:

## PRELIMINARY STATEMENT

1.     This case does not belong in chapter 11 and should be converted to a case under chapter 7 or dismissed altogether.  As set forth in detail below, the gross mismanagement of the Debtor's business has resulted in continuing substantial losses, and further diminution of the Debtor's estate is inevitable.  Furthermore, the Debtor filed this case with no planning and no exit strategy, and there is no reasonable likelihood that it will be able to reorganize successfully in chapter 11.  Indeed, as of the time of this motion's filing, the Debtor and its subsidiaries must fund payroll tomorrow and the Senior Lenders are informed that the Debtor and its subsidiaries do not have cash sufficient to make payroll.  More importantly, the Senior Lenders believe that all or a substantial portion of the Debtor's cash constitutes cash collateral, which the Debtor is not authorized to use without the Senior Lender's consent (and which consent has not been given or even requested).

2.     EMHC commenced this chapter 11 case following years of cash flow negative operations, numerous accommodations by the Senior Lenders, months of continuing defaults (including multiple payment defaults) under the Credit Agreement, and only after the acceleration of the amounts due under the Credit Agreement on November 29, 2008 and commencement by the Secured Lenders, on December 2, 2008, of a judicial foreclosure and receivership proceeding (the "Foreclosure Proceeding") in the Circuit Court of Pulaski County, Arkansas (the "Arkansas State Court").

3.     The sole purpose of EMHC's bankruptcy filing was to stay the Foreclosure Proceeding and thwart the Secured Lenders' attempt to protect the rapidly deteriorating value of their collateral.  EMHC filed for bankruptcy with literally no pre-

2

bankruptcy planning and no strategy to effectuate a value-maximizing (or even value-maintaining) bankruptcy process.  Notwithstanding Silver Point's repeated offers of debtor in possession financing to facilitate an orderly bankruptcy process, the Debtor's management refused to consider any such option.  After repeatedly rejecting Silver Point's offers of additional financing to hire competent restructuring counsel, the Debtor opted instead to retain counsel the morning of the filing and neglected to conduct any due diligence regarding the ramifications of filing only EMHC, the parent entity, while leaving all of its operating subsidiaries (the "Subsidiaries") without the protection of the automatic stay (indeed counsel to the Debtor has informed counsel to the Secured Lenders that they did not have enough cash on hand to pay the filing fees for the Subsidiaries).  This ill advised strategy risks triggering cross defaults under every single one of the Subsidiaries' affiliation agreements and programming contracts with catastrophic consequences to the value of the company's operations.

4.     The Secured Lenders are no longer willing to facilitate the  management's wanton destruction of value and will not consent to the use of their cash collateral (even if the Debtor actually filed such a request, which it has not).l.  The Debtor has no alternative sources of funding and cannot provide adequate protection to the Secured Lenders to justify its use of their cash collateral despite their objection.  Accordingly, the Debtor will not be authorized to make any post-petition payments, while unauthorized use of the Secured Lenders' cash collateral would constitute a separate grounds for conversion of this case to chapter 7 or outright dismissal.

5.     Based on the Debtor's demonstrated inability to operate profitably – with a history of consistently negative EBITDA since 2001 – there is no prospect for a successful restructuring, and the Court should either convert this case to a case under chapter 7 or dismiss it altogether.  As an alternative, based on the Debtor's obvious inability to offer adequate

protection to the Secured Lenders, the Court should lift the automatic stay to allow the Secured Lenders to continue the Foreclosure Proceeding in the Arkansas State Court.

6.     In further alternative, if the Court declines to convert this case to chapter 7, dismiss it or lift the automatic stay to enable the Secured Lenders to pursue their remedies in the Arkansas State Court, the Court should appoint a chapter 11 trustee to administer this case. The Debtor's estate cannot be properly administered with the current management at the helm since such management and the Board have consistently demonstrated incompetence, dishonesty, total disregard of their fiduciary duties and inability to work with the Debtor's secured and unsecured creditors.  Rather than entering into productive negotiations with the Secured Lenders who repeatedly tried to work with the Debtor to facilitate a workable solution to its liquidity problems, including by offering to provide debtor in possession financing as part of a chapter 11 filing, the Board opted to threaten to simply abandon its charge.  In the past few weeks, on multiple occasions as the Debtor was steadily running out of cash with no plan or prospects for improvement, the Board refused to accept -- or even to negotiate regarding -- fair and reasonable proposals from the Secured Lenders to provide funding through debtor in possession financing. The Board's strategy of holding the Secured Lenders' collateral hostage to extract additional funding on the Board's unreasonable terms evidences disdain for the creditors' rights that merits appointment of a trustee.

## FACTUAL BACKGROUND

### I.     Credit Agreement and Amendments

7.     As of December 8, 2008 (the "Petition Date"), the Debtor and the Subsidiaries (collectively, the "Company") were indebted to the Secured Lenders under the Credit Agreement in the aggregate outstanding amount of over $41.5 million, consisting of the principal amount of two term loans, plus accrued and unpaid interest, as well as certain fees and

4

costs payable under the Credit Agreement (the "Secured Debt").  The Company's obligations on account of the Secured Debt are secured by first priority liens on substantially all of the Company's tangible and intangible assets (the "Collateral").

8.      Despite Silver Point's repeated efforts to facilitate opportunities for the Company to formulate an effective business plan that would enable it to run its business at a profit, the Company has simply been unable to do so.  Since the beginning of this year, the Company has presented Silver Point with different business plans, none of which it was capable of effectuating on a profitable basis.  In fact, since the beginning of Silver Point's involvement with the Company, the Company has consistently been unable to generate enough cash to operate without repeated additional borrowings from the Secured Lenders and – since at least 2001 – has consistently maintained negative EBITDA.  As a result, the Company also has been continually unable to satisfy claims of its critical trade creditors.  Moreover, instead of formulating a viable business plan, the Company has been plagued by continual infighting among the members of the management and the Board.

9.      Beginning over nine months ago, the Company repeatedly triggered numerous events of default under the Credit Agreement – missing interest payments and violating financial covenants and agreements to sell assets and pay down the Secured Debt. Nevertheless, Silver Point has patiently worked with the Company to help it amend the Credit Agreement and maximize the value of its assets for all parties in interest.  It was in this spirit that Silver Point agreed to the numerous amendments to the Credit Agreement and repeatedly agreed to forbear from enforcing the Secured Lenders' rights and remedies.

10.      First Amendment.  Specifically, after the Company failed to make an interest payment due March 1, 2008 and failed to achieve a minimum monthly EBITDA and

revenue requirements (as well as incurring several defaults under the Credit Agreement) (the foregoing, the "Existing Defaults"), on March 19, 2008, the Secured Lenders agreed to amend the Credit Agreement by committing to (a) forebear until the earlier of April 18, 2008 or a Termination Event,[2] from exercising remedies available to them on account of the Existing Defaults, and (b) extend additional borrowings of over $3 million to the Debtors (the "First Amendment").  In addition, pursuant to a letter agreement (the "Letter Agreement"), the Company agreed to a timetable to obtain *bona fide* purchase agreements with third parties to sell stations in order to generate cash proceeds to pay down the Secured Lenders.

11.     Defaults Under the First Amendment.  Despite the Company's commitment pursuant to the Letter Agreement to market its TV stations, it became apparent that the Board either had no intention of effectuating the station sales or were ineffective and disorganized in doing so.  The Company went through the motions of retaining Patrick Communications, L.L.C. ("Patrick"), purportedly to market the stations.  However, upon information and belief, on numerous occasions, Patrick reportedly found potential purchasers for certain of the stations on reasonable market terms at values previously discussed with the Company, but the Board subsequently increased its value expectations for the relevant station assets and stymied the sales.  The Company also repeatedly did not to facilitate potential purchasers' due diligence by failing to populate data rooms and being slow to respond to information requests – ultimately causing some potential purchasers to pull out of the bidding process.  In some cases, the inspection of a station's assets during the due diligence process revealed undisclosed material misrepresentations that caused the potential buyer to either severely reduce or withdraw a previous offer.  The Board's motivation – to keep control of the

---

[2]     "Termination Event" was defined in the First Amendment and in both subsequent Amendments as, inter alia, the occurrence of a default or event of default pursuant to the Credit Agreement.

Company for the benefit of insiders and equity holders in derogation of its fiduciary duties to creditors – was clearly demonstrated by these and other actions.[3]

12.    <u>Second Amendment.</u>  When the Existing Defaults continued, and it became apparent that further forbearance and concessions would be necessary, on April 28, 2008, the Secured Lenders agreed to another amendment of the Credit Agreement (the "<u>Second Amendment</u>"), whereby (a) they agreed to continue to forebear until the earlier of May 5, 2008 or a Termination Event from exercising remedies available to them on account of the Existing Defaults, (b) consented to the Company's attempts to enter into agreements with new investors, and (c) committed to extend to the Company additional borrowings in amounts not to exceed approximately $2.5 million beyond the additional loans extended in the First Amendment.

13.    <u>Failed Attempts to Raise Funds.</u>  Following the Second Amendment, the Company negotiated term sheets with The Yucaipa Companies, LLC ("<u>Yucaipa</u>") and Paulson & Co. Inc. ("<u>Paulson</u>") regarding a potential investment by certain affiliates of Yucaipa and Paulson in exchange for senior secured notes convertible into preferred stock of EMHC. However, after conducting due diligence, both Yucaipa and Paulson decided against going through with the investment and, in May 2008, abandoned discussions.  In a purported attempt to find other potential equity investors or purchasers of their assets, the Company engaged Thomas Weisel Partners ("<u>Weisel</u>"), an investment banking firm, in the first half of 2008.  Although Weisel prepared an information memorandum and contacted, the Secured Lenders believe, over 50 parties to solicit interest, its marketing effort apparently has not yielded any results.  To date,

---

[3]        Based on the Debtor's most recent annual report filed with the U.S. Securities and Exchange Commission, as of March 28, 2008, members of the Board and executive officers of the Debtor hold approximately 25% of the Debtor's common  stock. <u>See</u> Equity Media Holdings Corp., Annual Report (Form 10-K), at 113-14 (Mar. 31, 2008).

the Company has not informed Silver Point of any firm offers to invest in or purchase its business.

14.     <u>Third Amendment.</u>  On June 24, 2008, yet another amendment to the Credit Agreement (the "<u>Third Amendment</u>") became necessary.  Pursuant to the Third Amendment, the Secured Lenders (a) agreed to continue to forebear until, effectively, the earlier of a Termination Event and September 15, 2008 (at the sole discretion of the Requisite Lenders) from exercising remedies available to them on account of the Existing Defaults, as well as additional defaults (consisting of missed interest payments due on April 1, 2008 and May 1, 2008), (b) consented to the sale of certain of the Company's assets and to the Debtors' funding of their operations with a portion of the proceeds from such sale, rather than paying down the Secured Debt, and (c) committed to extend to the Company additional financing of $1.5 million. In connection with the Third Amendment, the Company committed to retain an acceptable outside chief restructuring officer or a financial advisor to help it turn its business around.

15.     <u>Defaults Under Third Amendment.</u>  Within weeks of entering into the Third Amendment, the Company breached its terms with the occurrence of additional defaults by, among other things, failing to satisfy certain milestones or targets with respect to the required station sales and to complete many of the other post-closing requirements of the Third Amendment.  On December 1, 2008, the Company failed to make a required interest payment, which constituted an additional default under the Credit Agreement.

16.     <u>Appointment and Dismissal of CRO</u>.  The Company selected and appointed Paul Brisette to serve as its Chief Restructuring Officer ("<u>CRO</u>") on or about October 20, 2008.  Upon his arrival, Mr. Brisette began cutting costs and evaluating prospects for an operational turnaround.  However, in less than one month, on or about November 9, 2008, after a

series of confrontations with certain members of the Board, Mr. Brisette's engagement was terminated by the Board.  On November 16, 2008, the Board proposed to fill the role of CRO with Robert Becker, a long-time insider.

17.  <u>Company's Admissions</u>.  On November 25, 2008, in connection with an action pending before the Arkansas State Court with respect to appraisal rights owed to certain equity holders arising from the merger of Equity Broadcasting Corporation into EMHC in 2007 (the "<u>Shareholder Action</u>"), EMHC filed a motion seeking a three month continuance to allow EMHC to raise additional funds to pay counsel and its expert valuation witness, or in the alternative, leave for EMHC's counsel to withdraw.  In support of the continuance motion, James Hearnsberger, EMHC's then Vice-President – Finance Administration, filed an affidavit (attached hereto as <u>Exhibit A</u>), wherein he stated that "EMHC [is] currently experiencing severe cash shortages. . . . [and] having difficulty meeting the daily expenses necessary to run the business." <u>Id.</u> at ¶ 8.  EMHC, which currently owed its counsel a balance of $56,254.35 and had not made a payment to counsel in approximately three months, did "not currently have cash on hand to pay legal or expert witness fees and expenses." <u>Id.</u> at ¶¶ 9, 13.  "In addition to financial difficulties, EMHC ha[d] experienced *frequent* and *disruptive* management changes since the merger" (Hearnsberger Aff. at ¶ 6 (emphasis added)), noting that in the approximate 15 months since the merger, EMHC had had three CEOs and one CRO, who had been terminated by the Board after having only served 20 days.

18.  <u>Acceleration Notice</u>.  On November 28, 2008, Silver Point notified the Debtor that, due to the multiple ongoing defaults, all of the Secured Lenders' commitments under the Credit Agreement and related documents were terminated and the Company's obligations thereunder were accelerated and became immediately due and payable.

19.    <u>Foreclosure and Receivership Proceeding</u>.  On December 2, 2008, Silver Point initiated the Foreclosure Proceeding in the Arkansas State Court and served the complaint and related summons on the Debtor at its corporate headquarters that same day.  On December 3, 2008, Silver Point filed a Petition for Appointment of a Receiver and for Emergency Hearing and a hearing was scheduled thereon for 2:00 p.m. (CST) on December 8, 2008, before the Arkansas State Court (the "<u>Receivership Hearing</u>").

20.    <u>Bankruptcy Filing</u>.  At 1:54 p.m. (CST) on December 8, 2008, just six minutes before the Receivership Hearing was scheduled to commence, EMHC filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

21.    <u>Default Judgment</u>.  While EMHC apparently timed its bankruptcy filing to prevent the Receivership Hearing from going forward, its management and Board were apparently less concerned with the trial of the Shareholder Action that was coincidentally scheduled for the same day, December 8, 2008.  In fact, EMHC failed to appear or present evidence at trial.  The respondents went forward, and the Arkansas State Court entered a judgment against EMHC in the amount of $1,224,155.80, plus interest at 9.75%, plus attorneys' fees, costs and expert fees in the amount of $75,000.  Notwithstanding its intention to file for bankruptcy and invoke the protections of the automatic stay later that same day, the Debtor neglected to file its three page petition form until after a significant judgment was entered against it in the Shareholder Action.  The failure by the Debtor's management to either prosecute the Shareholder Action or file for bankruptcy protection before a judgment was entered evidences both their gross incompetence and complete abdication of their fiduciary duties.

**II.    Dealings of Board and Management with Key**
**       Parties in Interest to Detriment of Debtors' Businesses**

22.     Prior to and during the time period in which Silver Point patiently worked with the Company to help it restructure the Secured Debt and maximize value of its assets for all parties in interest, the Debtor's management and certain members of the Board have caused significant damage to the Company's business and assets through their questionable dealings with lenders, trade creditors, regulators and the Company itself.

A.     **Board's Dealings with Secured Lenders**

23.     On October 3, 2008, Silver Point, on behalf of the Secured Lenders, transmitted to members of the Board two alternative proposals for restructuring the Company's obligations, one of which contemplated a chapter 11 filing, while the other did not, and both of which the Secured Lenders were prepared to fund.  The proposal that would have required chapter 11 filings was rejected by the Board then chairman, Richard C. Rochon ("Rochon"), the very next day.  Thereafter, Rochon informed Silver Point that he would never work with Silver Point to facilitate an orderly sale of the Company's assets in bankruptcy, rather he and the other Board members would simply resign and walk away, allowing the Company's stations to cease operations and "go dark."

24.     Thereafter, Silver Point attempted to negotiate in good faith another proposal that did not require any bankruptcy filings.  After weeks of negotiations with the Debtors, and certain other parties, despite Silver Point making significant concessions, the parties could not come to terms.  During this time, the Debtor, to Silver Point's knowledge, made no efforts to formulate any alternate back-up plans.

25.     On November 12, 2008, Silver Point was informed by the Board that the Company was, indeed, contemplating ceasing operations – purportedly out of a fear that it could not make the payroll.  On the next day, Silver Point again offered to provide the Company with debtor-in-possession financing in the event of a chapter 11 bankruptcy filing in the form of

11

incremental loans of up to $3-5 million to serve as a bridge to an orderly sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code (the "Silver Point DIP Proposal"). The Silver Point DIP Proposal was on below-market terms for debtor-in-possession financing and intended to facilitate a straightforward process whereby the Company could maximize value for all stakeholders.

26.     In a variation of Rochon's earlier proclamation, that the Company would never file for bankruptcy, at this point he informed Silver Point that the Company would never "accept" debtor-in-possession financing from the Secured Lenders and, instead, would find an alternative lender to provide senior debt by "priming" the Secured Lender's liens on their collateral. Such alternate financing – which in any case would have violated the Bankruptcy Code – was never found.

27.     Notably, at the same time that the Company threatened to cease operations and "go dark", on the one hand, and to file for bankruptcy and "prime" the Secured Lenders, on the other, its then most recent cash projections projected receipts from operations of $580,000 for the two weeks commencing on November 17, 2008. On information and belief based upon an email from a member of the Board to Silver Point dated November 15, 2008, the payroll during that two week period was projected to be $308,000. Accordingly, it appeared that the Company would be able to meet payroll and that the threat to cease operations was nothing but an attempt to force the Secured Lenders to provide further concessions. When asked by representatives of Silver Point whether or not the Company was threatening Silver Point with outright destruction of collateral value, Rochon responded that it was not a threat, merely that he had (despite Silver Point's repeated chapter 11 financing proposals) no other choice.

28.     Nevertheless, on November 16, 2008, by a letter to the Board, a copy of which is attached hereto as Exhibit B, Silver Point yet again offered, to the extent that the Company's own projections were inaccurate, unreliable or not reflecting its true financial state, financing sufficient to fund an orderly going concern sale of its assets in chapter 11, thus avoiding the unnecessary destruction of value that would have inevitably resulted from cessation of operations.  Yet again, Silver Point's offer was flatly refused by Rochon.

29.     On November 18, 2008, Rochon again informed Silver Point that in the event of a bankruptcy filing, he and potentially other members of the Board and management would simply "walk away."  In addition, Rochon informed Silver Point that the Board members were wrong in their assertion that the Company could not meet payroll, but in fact were expected to meet payroll after a conversation with the Debtors' CFO.  This lack of knowledge of the business is typical of the Board members.

30.     Since the beginning of 2008, the Company has presented Silver Point with different business plans for their operations, each of which the Company has been incapable of effectuating on a profitable basis.  The Board and the Company's current management have repeatedly and consistently acted to jeopardize the viability of the Company's business, in the process destroying the value of the Collateral and impairing the Secured Lenders' security interest.  Furthermore, they have threatened to take steps in the future that would inevitably further threaten the Company's viability and erode the value of the Collateral.  The further diminution of the Debtor's estate is guarantied.

### B.    Debtors' Dealings with Critical Vendors

31.     On November 25, 2008, the Company received from Intelsat, a critical provider of the Company's satellite transmission service that enables it to broadcast programming content to its stations, an e-mail demanding that all past due amounts be paid by

13

December 3, 2008 and indicating that Intelsat' services would be discontinued unless full payment was not made by such date.  The Company forwarded the Intelsat e-mail to Silver Point. A termination of Intelsat's service would have a devastating impact on the Company's revenues, as the Company relies on Intelsat to provide satellite service for all or substantially all of its stations to be able to broadcast.

32.     On December 2, 2008, representatives of Silver Point received an e-mail from Pat Doran, the Debtor's then CFO stating that Intelsat would shut off service on December 5, 2008 unless all past due amounts were paid by such time.  Silver Point entered into negotiations with the Company to provide $288,000 of additional funding pursuant to yet another amendment to the Credit Agreement in order to avoid the immense loss of value to all parties in interest that would undoubtedly result from disruption in the transmission services provided by Intelsat.  The Company also received a commitment for funding of $155,000 from a third party. By e-mail dated December 4, 2008, a copy of which is attached hereto as Exhibit C, Pat Doran reached an agreement with Intelsat pursuant to which the Company had to pay $583,931.25 to Intelsat in exchange for Intelsat's agreement "to leave all transponders on" until January 3, 2009. However, the Company did not make the payment to Intelsat and on or about December 5, 2008, Pat Doran was terminated by the Board.  Silver Point understands that Intelsat told the Compnay on December 5, 2008 that all service would be cut off at the close of business on December 9, 2008 absent an agreement satisfactory to Intelsat.

33.     On information and belief, absent a bankruptcy filing, the Company would have been required to make payment to Intelsat in an amount of approximately $864,000, in order to keep the satellite signal from Intelsat online.[4]  On information and belief, if Intelsat

---

[4]     In addition, on information and belief, the Company is four months past due to NBC on its obligations for programming content.

terminates service to the Company, all or substantially all of the Company's stations will "go dark," thus causing a serious diminution in value of the Collateral.  Apparently, the management and the Board, rather than attempting to take steps to prevent this result, were satisfied with allowing the Collateral to be destroyed.  This prospect, as well as a demand notice for full payment from the Bank of Little Rock with respect to the mortgage on the Debtors' headquarters prompted Silver Point to send the acceleration notice and commence the Foreclosure Proceeding.

**C.**    **Debtors' False Representations to FCC**

34.    The Federal Communications Commission (the "FCC") is the Company's principal regulator.  The Company's efforts to market their stations may be hampered by the pendency of an investigation by the FCC into a series of false certifications made by EMHC's management in sworn statements in multiple reports, applications and other formal submissions to the FCC pertaining to the Company's operation of KLMN (TV) in Great Falls, Montana ("KLMN").

35.    Specifically, EMHC certified to the FCC that KLMN was broadcasting and complying with its regulatory obligations to include a certain amount of educational content in its broadcasts.  In reality, KLMN was broadcasting only a series of color bars telling viewers that the station was off the air.  As a result, upon information and belief, the FCC placed a "hold" on license renewal, license assignment, and transfer of control applications for all or almost all of the Debtors' full-power television stations until the resolution of the investigation(s) into the KLMN matter.

36.    Upon information and belief, the hold related to the KLMN matters resulted in the failure to close the sale of Utah television station KUTF (and its translator station, K45GX) to Univision, a transaction that, had it closed, would have resulted in the cancellation of a $15 million promissory note owed to Univision.  Specifically, the Company agreed to assign to

15

Univision the assets of KUTF and K45GX as consideration for the outstanding preferred stock of Equity Broadcasting Corporation held by Univision and for Univision's consent to the Debtor's entry into a transaction known as the "SPAC Merger" for which Univision's consent was required. Due to FCC restrictions, the station transfer could not be immediately effectuated and, accordingly, the Debtor issued Univision a $15 million 1-year promissory note that would have been cancelled upon the closing of the sale of this station to Univision.

37.    On August 9, 2007, the relevant parties applied to the FCC for consent to the assignment of the applicable licenses. On information and belief, as a result of the hold on the Company's stations, the FCC did not act on the assignment application. Univision accordingly terminated the sale agreement, and the FCC thereafter dismissed the assignment application. The Univision note therefore became due and payable, with interest, as of April 1, 2008. The Company's inability to renew licenses or engage in additional station sales has further impaired – and will continue to impair -- the value of the estate.

38.    The degradation of the value of the estate will inevitably continue because many of the Company's stations have not yet made the necessary technical changes to comply with FCC regulations mandating a switch to full power digital service by the February 17, 2009 deadline. Even if the deadline for compliance is extended with respect to these stations, the requisite full power digital conversion will require significant investment from any potential purchaser, further driving down demand and, therefore, value.

### D.    **Management's Self-Dealing**

39.    The Company has employed a series of directors and officers that, through mismanagement and self-serving transactions, have breached their fiduciary duties to the Company and creditors alike, as well as caused a continuing diminution of the value of the Company. Various members of the Board hold large equity interests in the Debtor and despite

the Company's financial condition, on information and belief, they have failed to sell key corporate assets because they have been more focused on preserving potential equity "upside" than on meeting the Company's obligations to the Secured Lenders and other creditors.

40.     While employed at Equity Broadcasting, Inc. n/k/a EMHC and likely utilizing company resources, the Debtor's founder and then CEO and current Board member Morton, claims to have developed the concept for the Retro Television Network ("RTN"), a network providing content consisting of syndicated programming obtained from the CBS Network ("CBS") that "takes some of the most popular and entertaining programs from the 60s, 70s, 80s, and 90s, all ratings proven and digitally re-mastered, and provides them to their RTN affiliate." See EMHC Annual Report, Form 10-K, filed March 31, 2008.

41.     Because the RTN concept was developed by employees of the Company in the course of their employment, the intellectual property associated with RTN properly belonged to the Company.  Nonetheless, on information and belief, at some point following development of the RTN concept, Morton formed Retro Television Network, Inc. (the "Morton Entity") for the purpose of securing to himself, at the Company's expense, the intellectual property pertaining to RTN.

42.     Pursuant to that certain EBC-RTN Intellectual Property Agreement, dated December 22, 2005 (the "IP Transfer Agreement" attached hereto as Exhibit D), the Morton Entity purported to transfer to the Company all of its rights in RTN, except for the "creative and intellectual rights."  In exchange for such transfer, the Morton Entity retained the right to receive (i) royalty payments representing ten percent (10%) of the net revenue received by RTN from all sources and (ii) a participation equal to 20% of any proceeds of a sale of RTN.  See IP Transfer Agreement at ¶ 1(a).

17

43.     Morton, acting in his capacity as the Debtor's CEO, executed the IP Transfer Agreement on behalf of the Company.  Morton was granted rights to receive large sums of the Debtors' money purportedly in exchange for the right to use property that rightfully belonged to the Company in the first place.  On information and belief, certain members of the Board only became aware of the IP Transfer Agreement nearly two years after the fact when it was brought up by Yucaipa and Paulson in the course of their due diligence.

44.     Morton's appropriation of the intellectual property of RTN was merely a single episode in a pattern of his using the Company assets for personal gain.  Morton, who has placed numerous family members on the Company's payroll (one of his daughters served as general counsel while the other served in no particular position at all and is reported to have operated an internet mail order business using company resources), has been accused of backdating pay raises for the members of his family and making lump-sum catch up payments.

45.     As a further testament to the proclivities of the Debtor's management and Board for insider dealing, on November 26, 2008, Morton (though still on the Board) commenced a lawsuit in the Arkansas State Court against the Debtor and RPS seeking approximately $2.5 million for amounts allegedly owed to him under the terms of various agreements entered into in connection with the Luken Agreements (defined below).

### E.    Dealings with Trade Creditors

46.     Following the Debtor's entry into the IP Transfer Agreement, the Company entered into another transaction for the sale of corporate assets to Henry G. Luken III ("Luken"), an equity investor that took over as the Debtor's Chief Executive Officer, Chairman of the Board and President in February 2008 and stepped down from that position on or about May 15, 2008.  On June 24, 2008, EMHC, C.A.S.H. Services, Inc., a wholly-owned subsidiary of EMHC ("CASH"), and Retro Programming Services, Inc., a wholly owned subsidiary of

18

CASH ("RPS"), entered into that certain Stock Purchase Agreement (the "Luken SPA" attached hereto as Exhibit E, and, along with the related agreements executed in connection therewith, the "Luken Agreements") with Luken Communications, a company affiliated with Luken, whereby, among other things, Luken Communications would acquire the common stock of RPS, several stations and warrants to purchase common stock of EMHC in exchange for a commitment by Luken Communications to pay an aggregate purchase price of $37.5 million: $18.5 million for RTN, $1.5 million for warrants to purchase shares of common stock, and $17.5 million for the station sales (of which $5 million was paid as an initial down payment, with a $12.5 million balance due at closing of the station sales).

47.     Pursuant to the Luken Agreements, the Company committed to use a portion of the $5 million down payment made by Luken to make certain payments on account of the RPS's obligations, including a $1.3 million obligation to CBS for programming used by the RTN.  As a condition precedent to entry into the Luken Agreements, the Company was required to obtain a fairness opinion from Weisel as well as consent from the Secured Lenders for the disposition of RPS, which was part of the Secured Lenders' Collateral.  In connection with the requests for authorization from the Secured Lenders for the release of a portion of Collateral, the Compnay provided Silver Point with the cash flow projections attached hereto as Exhibit F.  In none of these projections did the Company reflect the $1.3 million payment that it committed to make with the proceeds of Luken's down payment.

48.     On information and belief, the $1.3 million payment obligation to CBS resulted from the Company's prior failures to make required payments to CBS under license agreements and to cease using content provided by CBS notwithstanding CBS's demands to cease and desist from doing so.  Following execution of the Luken Agreements, the Company

breached their obligations to make the payment to CBS as contemplated by those agreements, yet again demonstrating management's incompetence and disregard of contractual obligations to the Company counterparties.  As a result, on September 14, 2008, CBS commenced an action (the "CBS Action") against the Debtor and certain of the Subsidiaries in the United States District Court for the Central District of California for copyright infringement, breach of contract and *quantum meruit* as a result of RPS's unauthorized use of content provided by CBS for the RTN network.

49.     The defendants in the CBS Action were required to respond to the complaint on or about October 14, 2008.  In another flagrant example of the incompetence of the management and Board, the defendants failed to answer or otherwise defend against CBS's allegations and, on December 1, 2008, CBS sought a default judgment against the Company.  On December 3, 3008, a default was entered against each of the defendants in the CBS Action (except for Marquette Broadcasting, Inc. due to a misspelling of that entity's name in CBS's filings).

### RELIEF REQUESTED

50.     For the reasons set forth herein, Silver Point, on behalf of the Secured Lenders, respectfully requests that this Court enter an Order, pursuant to section 1112(b) of the Bankruptcy Code, converting these cases to chapter 7 or dismissing them altogether. Alternatively, Silver Point requests that the Court, pursuant to section 362(d) of the Bankruptcy Code, lift the automatic stay to allow the Secured Lenders to exercise remedies available to them under the Credit Agreement and applicable law and continue the Foreclosure Proceeding, or in further alternative, pursuant to section 1104(a) of the Bankruptcy Code, appoint a chapter 11 trustee.

I.      **Ample Cause Exists To Convert This Case To Chapter 7 Or To Dismiss It Altogether**

        A.      **Legal Standards For Conversion Or Dismissal**

        51.      Section 1112(b) of the Bankruptcy Code provides that, on request of a party in interest and after notice and a hearing, "the Court **shall** convert a case to a case under chapter 7 or dismiss a case . . . , whichever is in the best interests of creditors and the estate, if the movant establishes cause."  11 U.S.C. § 1112(b)(1) (emphasis added).

        52.      Section 1112(b)(4) of the Bankruptcy Code enumerates a list of grounds establishing "cause" for conversion or dismissal.  Among such grounds are (a) "substantial or continuing loss to or diminution to the estate and the absence of a reasonable likelihood of rehabilitation," and (b) "gross mismanagement of the estate."  11 U.S.C. § 1112(b)(4)(A) and (B).

        53.      Furthermore, this list is non-exhaustive and courts may consider additional factors and exercise their equitable powers to find cause to convert or dismiss a case that should not remain in chapter 11.  See In re Adams, 292 B.R. 365, 368 (Bankr. E.D.Ark. 2003) ("The examples warranting dismissal [or conversion] for cause listed under § 1112(b) are not exhaustive and the court is free to consider other factors as they arise and to use its equitable power to reach an appropriate result in individual cases.") (internal citations omitted); In re Galvin, 49 B.R. 665, 668 (Bankr. N.D. 1985) ("The enumerated list of what might constitute cause for dismissal [or conversion] of a chapter 11 proceeding is non-exhaustive.  What might constitute cause for dismissal [or conversion] of a chapter 11 proceeding is a matter of judicial discretion under the circumstances of each case.").

        54.      In determining "cause," the court should assess the totality of circumstances, the best interests of the creditors and the purpose of the particular case.  See In re

Gonic Realty Trust, 909 F.2d 624, 626-627 (1st Cir. 1990) ("in determining 'cause' for dismissal or conversion the court may consider other factors as they arise and use its powers to reach appropriate results in individual cases.  The court, however, must exercise its sound judgment in reaching a determination and must ascertain that the decision is in the best interest of creditors") (internal citations omitted); AmeriCERT, Inc. v. Straight Through Processing, Inc. (In re AmeriCERT, Inc.), 360 B.R. 398, 401 (Bankr. D. N.H. 2007) ("In determining whether [there is] cause, the Court must assess the totality of the circumstances, including the best interests of the creditors and the purpose of the bankruptcy case.").

55.     However, once "cause" has been shown, the court's discretion to refuse conversion to chapter 7 or dismissal is limited.  See In re Gateway Access Solutions, Inc., 374 B.R. 556, 560 (Bankr. M.D. Pa. 2007) ("[T]he statutory language [is] mandatory.  The amendments to § 1112 limit the Court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause."); In re AmeriCERT, Inc., 360 B.R. at 401 ("amended section 1112(b) was changed to afford courts less discretion . .  amended section 1112(b) provides that a court 'shall' dismiss [or convert] if cause is found, absent unusual circumstances.") (internal citation omitted).

56.     Thus, once the movant establishes "cause" to convert or dismiss, the burden shifts to the debtor, and the case **must** be converted or dismissed unless the court specifically identifies "unusual circumstances" that establish such relief "is not in the best interests of the creditors and the estate."  See 11 U.S.C. § 1112(b)(2); In re Kholyavka, 2008 WL 3887653, 5 (Bankr. E.D. Pa. 2008) (after the movant establishes "cause," "the burden shifts to Debtor to establish unusual circumstances that would warrant continuation of the chapter 11 proceedings as in the best interests of creditors and the estate."); In re Gateway Access Solutions,

Inc., 374 B.R. at 560 ("If the Movants establish 'cause,' then the burden shifts to the Debtor to prove it falls within the § 1112(b)(2) 'unusual circumstances' exception to § 1112(b)(1)'s mandatory conversion

57.     As demonstrated below, there is sufficient cause to convert these cases to chapter 7 or dismiss them altogether, and the Debtors cannot establish unusual circumstances to overcome the showing of such cause.

**B.      Gross Mismanagement, Substantial And Continuing Loss Of Value, And Unlikelihood Of Rehabilitation Establish Cause For Conversion Or Dismissal**

58.     As set forth in detail above, the Board's gross mismanagement and continuing diminution of the Company's value at its watch is exemplified by the repeated failures to carry out any viable business plan, comply with commitments made to the Debtor's lenders and other contractual counterparties, or to present the Company truthfully in sworn statements to its regulators.  The management's "achievements" have been to run a negative cash flow and negative EBITDA business that has been unable to fund its day to day operation expenses even though it has not serviced its interest obligations to the Secured Lenders from internal sources for quite some time.

59.     The Debtor's habitual negative cash flow and destruction of asset values evidence both "significant" and "continuing" loss and diminution of value, thus establishing cause for conversion or dismissal.  See Loop Corp. v. United States Trustee, 379 F.3d 511, 515-516 (8th Cir. 2004) ("negative cash flow situation alone is sufficient to establish 'continuing loss to or diminution of the estate.'"); In re Denrose Diamond, 49 B.R. 754, 756 (Bankr. S.D.N.Y. 1985) ("Diminution of the estate sufficient to motivate conversion has been found where a secured creditor's collateral was rapidly depreciating, no unencumbered assets remained and no prospects existed to produce income."); In re Route 202 Corp. t/a Lionti's Villa, 37 B.R. 367,

374 (Bankr. E.D. Pa. 1984) ("Obviously, if the debtor has negative cash flow after entry of the order for relief in the chapter 11 case, the [elements of § 1112(b)(1) are] satisfied").

60.     Moreover, as the Secured Lenders have demonstrated, the Debtor has no prospect for an effective rehabilitation under the existing circumstances.  Given the dire condition of the Company's business, the pattern of the management's self dealing and violation of its fiduciary duties, the "hold" put on any transactions by the FCC, and the Debtor's lack of credibility with its various stakeholders, it is unreasonable to expect that any feasible plan of reorganization can be proposed, let alone confirmed in this case.  The Debtor is highly leveraged and in default under the Secured Debt, yet, in a glaring example of irresponsible and reckless management, it has eschewed offers by the Secured Lenders to help it sell its assets and maximize value for all stakeholders.  The same mismanagement responsible for the continually negative cash flow and rapidly depreciating assets has now led the Debtor into chapter 11 with absolutely no exit strategy.

61.     The Debtor's only option is to sell off its assets since it lacks any ability to "re-establish [its business] on a firm, sound basis."  In re Wright Air Lines, Inc., 51 B.R. at 100. There is no likelihood of rehabilitation for the Debtor as a debtor cannot rehabilitate if it has no ability to restore the viability of its business.  See Loop Corp. v. United States Trust, 379 F.3d at 516 ("Courts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its business.") (internal citations omitted); In re Gonic Realty Trust, 909 F.2d at 627 ("[W]ith no business left to reorganize, chapter 11 proceedings were not serving the purpose of rehabilitating the debtor's business."); In re The Ledges Apartments, 58 B.R. 84, 87 (Bankr. D. Vt. 1986) ("Reorganization encompasses rehabilitation and may contemplate liquidation.  Rehabilitation, on the other hand, may not include liquidation."); In re Wright Air

24

Lines, Inc., 51 B.R. 96, 100 (Bankr. N.D. Ohio 1985) ("Rehabilitation as used in 11 U.S.C. Section 1112(b)(1) means to put back in good condition; re-establish on a firm, sound basis.") (internal quotation omitted).

62.    The Board and management simply must not be permitted to spend time incurring administrative expenses in bankruptcy without any viable exit strategy.  The Debtors should not be permitted to conduct a futile restructuring experiment while continuing to hemorrhage value at the expense of their creditors.  See Loop Corp. v. United States Trust, 379 F.3d at 516 ("The purpose of § 1112(b)(1) is to 'preserve estate assets by preventing . . . the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation.'") (quoting In re Lizeric Realty Corp., 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995)).

### C.    Conversion or Dismissal Is Also Warranted Because of Bad Faith

63.    "Cause" also exists to convert a chapter 11 case to chapter 7 or to seek its dismissal when the court finds "bad faith" on the part of the debtor in connection with the bankruptcy filing.  As the Eighth Circuit has acknowledged, while section 1112(b) "does not explicitly require that cases be filed in 'good faith,' [it] recognized that a bad faith filing can be cause for dismissal."  In re Cedar Shore Resort, Inc., 235 F.3d 375, 379 (8th Cir. 2000).  Accord. In re Kerr, 908 F.2d 400, 404 (8th Cir. 1990) (affirming dismissal on grounds that violation of court orders, self dealing and evasive conduct indicated "bad faith").

64.    While there is no single test for determining bad faith with respect to a bankruptcy filing, and the courts consider the totality of circumstances, a debtor's prepetition conduct is relevant to such determination.  See, e.g., In re United Imports, 203 B.R. 162, 171 (Bankr. D. Neb. 1996) ("A debtor's prepetition conduct may be relevant in certain circumstances to determine whether a debtor's petition was filed in bad faith and relief should be granted for

cause."); <u>In re Stamford Color Photo, Inc.</u>, 105 B.R. 204, 208 (Bankr. D. Conn. 1989) ("Factors which courts have relied upon in making a finding of bad faith include:  (1) the debtor has few or no unsecured creditors; (2) pre-petition conduct of the debtor was improper; (3) the petition allows the debtor to evade court orders; (4) the debtor has no ongoing business or employees; (5) there is no reasonable possibility of reorganization; (6) the debtor has little or no cash flow or income; (7) the case essentially involves the resolution of a two-party dispute which can be resolved in the state court; and (8) the debtor has only one asset."); <u>In re Grieshop</u>, 63 B.R. 657, 663 (N.D. Ind. 1986) (same).

65.     As illustrated above, improper conduct on the part of the Debtor's Board and management has led to the demise of the Company business.  Such improper conduct, in and of itself, may provide sufficient cause for conversion or dismissal.  <u>See</u>, <u>e.g.</u>, <u>In re 10 Bears at Chiloquin, Inc.</u>, 2007 WL 1673538 (Bankr. D. Or. 2007) (noting that cause includes "gross mismanagement of the debtor's affairs pre-petition," and finding "cause" existed based on, among other things, improper prepetition loans and questionable attempt by debtor to later disguise them as payments pursuant to employment agreements, debtor's failure to file tax returns and account for compensation paid, and failure to maintain debt service); <u>In re Forest Hill Funeral Home & Memorial Park</u>, 364 B.R. 808, 821-822 (Bankr. E.D. Okla. 2007) (finding cause to dismiss chapter 11 case under section 1112(b) where "[t]he prepetition conduct of [owners], in their capacity as acting management of [debtor], [was] rife with indicia of bad faith" based on, among other facts, that owners took millions of dollars from trust accounts and invested in high-risk ventures, owners actively misrepresented past and present control over companies and investments, and books and records had not been reconciled for years).

66.     Furthermore, courts both in the Eighth and other circuits have found that obtaining an advantage in litigation is not a proper motive for a bankruptcy filing, constitutes a clear abuse of the chapter 11 bankruptcy process and warrants a dismissal.  See, e.g., Cedar Shore, 235 F.3d at 379 (affirming dismissal for bad faith where bankruptcy court found that the debtor's motivation for the filing was not to effectuate a valid reorganization, but rather to prevent a state court action going forward).  Accord. In re SGL Carbon Corp., 200 F.3d 154, 165 (3rd Cir. 1999).

67.     In view of all of the foregoing, ample cause exists for the Court to convert this case to chapter 7 or for its dismissal.

**D.     Court Should Authorize and Direct Chapter 7 Trustee to Operate Debtor's Business**

68.     Once this case has been converted to a case under chapter 7 of the Bankruptcy Code, the Secured Lenders request that the Court utilize its discretion to authorize and direct the chapter 7 trustee to operate the Debtor's business.  Section 721 of the Bankruptcy Code provides that "[t]he court may authorize the trustee to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate."  11 U.S.C. § 721.  Such authorization is appropriate in a case where the debtor's business will be significantly more valuable as a going concern.  See, e.g., In re Quarter Moon Livestock Co. Inc., 116 B.R. 775 (Bankr. D. Idaho 1990) (bankruptcy court allowed trustee to operate cattle ranch until the autumn, in the interest of maximizing estate's value); In re A & T Trailer Park, Inc., 53 B.R. 144 (Bankr. D. Wyo. 1985).  Authorization to operate the debtor's business is also permissible when sudden termination would cause great hardship to innocent third parties.  See In re 30 Hill Top Street Corp., 42 B.R. 517 (Bankr. D. Mass. 1984).  Section 105 also empowers the Court to "issue any order, process, or judgment

that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). The Court should utilize its discretion to authorize and direct a chapter 7 trustee to operate the Debtor's business in order to maintain the value of such business as a going concern and prevent the great hardship that would otherwise befall the Debtor's creditors by avoiding the destruction of value that would necessarily result from the Company stations "going dark."

69. The Company operates broadcasting stations in a highly regulated industry. Each of the Company stations operates under an FCC broadcast license held by the applicable Subsidiary,] is affiliated with one of several networks through affiliation agreements and provides programming from certain content providers through programming contracts. If the Company's business is not operated, those FCC broadcast licenses will be at risk of revocation. Furthermore, many, if not all, of the Subsidiaries' affiliation agreements and programming contracts are terminable by the counterparties based on the Debtor's bankruptcy filing. Silver Point does not know how many of those agreements have been terminated to date, but any counterparty that does not terminate its agreement, will do so only in expectation of future revenues. If a trustee is not appointed and directed to operate the Debtor's business, the termination of those affiliation agreements and programming contracts, along with the corresponding destruction of value, is inevitable. Without those licenses and agreements, the value of the Company stations will indisputably be severely compromised if not wiped out entirely. Accordingly, Silver Point respectfully requests that the Court enter an order authorizing and directing the chapter 7 trustee to take all necessary steps to operate the Debtor's business.

## II. Automatic Stay Should Be Lifted to Allow Secured Lenders to Exercise Remedies

70. In the alternative, if the Court declines to convert the Debtor's chapter 11 case to chapter 7 or dismiss it outright, the Secured Lenders seek an order granting them

expedited relief from the automatic stay so that they may continue to pursue their remedies under the Credit Agreement and applicable non-bankruptcy law by pursuing the Foreclosure Proceeding.[5]

A.    **Statutory Authority for Granting Relief from the Automatic Stay**

71.    Bankruptcy Code section 362(d)(1) states in relevant part that, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . such as by terminating, annulling, modifying, or conditioning such stay for cause, including lack of adequate protection of an interest in property of such party in interest."  11 U.S.C. § 362(d)(1); see also In re Wiley, 288 B.R. 818, 822 (8th Cir. BAP 2003) ("Bankruptcy Code section 362(d)(1) provides that the bankruptcy court may grant relief from the automatic stay for cause.").  "Cause is an intentionally broad and flexible concept, made so in order to permit the courts to respond in equity to inherently fact-intensive situations."  In re Sentry Park, Ltd., 87 B.R. 427, 430 (Bankr. W.D. Tex. 1988); see In re Continental Air Lines, Inc., 61 B.R. 758, 780 (S.D. Tex. 1986) ("In sum, a bankruptcy court must be guided by equitable principles in exercising its discretion to enforce or modify the automatic stay"); see also Mooney v. Gill, 310 B.R. 543, 546 (N.D. Tex. 2002) ("The bankruptcy court must balance the hardships of the parties and base a decision on whether to modify the automatic stay on the degree of hardship involved and the goals of the Bankruptcy Code"); Wiley, 288 B.R. at 822 (same).

72.    Bankruptcy Code section 362(d)(2) provides an additional independent basis for lifting the automatic stay by stating, in the pertinent part, that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . with respect

---

[5]    The U.S. Supreme Court has recognized that relief from the automatic stay may be granted early in a bankruptcy case and prior to the end of the exclusivity period.  See United States Sav. Ass'n. of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 376 (1988) (hereinafter, "Timbers II").

to a stay of an act against property . . . if (A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2)(A).

73.     The statutory grounds for granting relief from the automatic stay are in the disjunctive. See 11 U.S.C. § 362(d)(1), (2); In re Martens, 331 B.R. 395, 398 (8th Cir. BAP 2005). Therefore, a bankruptcy court must grant relief if the movant is able to prove either "cause," or that there is no equity in the property and that such property is not necessary for a successful reorganization. See 11 U.S.C. § 362(d)(1), (2); Martens, 331 B.R. at 398.

### B.     Relief from Automatic Stay Is Appropriate Under Sections 362(d)(1) and (d)(2) of Bankruptcy Code

### 1.     "Cause" Exists to Grant Relief from Automatic Stay

74.     The Bankruptcy Code does not define "cause" as used in section 362(d)(1). "Cause" includes the lack of adequate protection of an interested party's interest in property. See 11 U.S.C. § 362(d)(1); In re Harper Development, 2002 WL 32114481, at * 3 (Bankr. E.D. Ark. July 19, 2002). The concept of adequate protection is intended to protect an entity's interest in property from a decline or threatened decline in value. See Harper, 2002 WL 32114481, at *3; Martens, 331 B.R. at 398 ("Cause has been defined to mean 'any reason whereby a creditor is receiving less than his bargain from a debtor and is without remedy because of the bankruptcy proceeding.'") (quoting In re Food Barn Stores, Inc., 159 B.R. 264, 267 (Bankr. W.D. Mo. 1993)).

75.     The factors relevant to the above determination, i.e., whether the secured creditor may get the full value of its bargain are as follows: "the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for a successful reorganization of the Debtor's affairs . . . and the Debtor's performance." In re All Rubber Prods., 137 B.R. 897, 901 (Bankr. N.D. Ohio 1992) (citation omitted). The Debtor must prove

that any proposed protection not only maintains the Secured Lenders' prepetition contractual rights, but also effectively compensates them for any decline in the value of the Collateral occasioned by its use.  See In re Swedeland Dev. Group, Inc., 16 F.3d at 564; In re Briggs Transp. Co., 780 F.2d 1339, 1342 (8th Cir. 1985) ("adequate protection is a safeguard which is provided to protect the rights of secured creditors, throughout the proceedings, to the extent of the value of their property"); Martens, 331 B.R. at 398 ("A creditor is entitled to relief from the automatic stay if the debtor is not making mortgage payments, and if there is insufficient equity in the property to adequately protect the creditor."); In re Kaplan Breslaw Ash, LLC, 264 B.R. 309, 333 (Bankr. S.D.N.Y. 2001) (finding that cause for relief from automatic stay is appropriate when debtor fails to make any post-petition payments to its secured creditor).  See also In re Phoenix Steel Corp., 39 B.R. 218, 224 (D. Del. 1984) ("The concept of adequate protection does not envision a court stripping a secured creditor of the benefit of its bargain ... the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.").

76.     Clearly, the performance of the Debtor's management and Board to-date has demonstrated no ability to operate the Company's businesses for anything remotely resembling a profit.  Each day the Debtor's assets remain under their management, the value of the Secured Lenders' Collateral declines and the prospects for meaningful recovery become more dim.  Quite simply, the Debtor has no prospect for a successful reorganization as evidenced by its long and singularly consistent history of losing money.  In fact, even without paying its debts (to the Secured Lenders as well as many of their major trade creditors), the Debtor has been consistently cash flow negative.  As such it is hard to perceive any benefit to be gained by

the incurrence of administrative costs in bankruptcy for purposes of giving the Board and

management additional opportunity to destroy the value of the Secured Lenders' Collateral.

77.    In addition, the Debtor's inability to sell the Company station assets

through multiple marketing efforts for any price -- much less a value sufficient to repay the

obligations secured thereby -- clearly demonstrates that the Secured Lenders have no "equity

cushion" whatsoever.  This indication of value provides further concrete evidence that the

Secured Lenders' interests in their Collateral are not adequately protected.

78.    For the numerous reasons set forth herein, the Debtors simply cannot

satisfy their burden of proving that the Collateral is not declining in value or that the Secured

Lenders are adequately protected such that they will receive the benefit of the bargain they had

contemplated when they executed the Credit Agreement.[6]  Accordingly, the automatic stay

should be lifted so that the Secured Lenders may proceed with the exercise of their applicable

non-bankruptcy remedies.[7]

## 2.    Stay Should Be Lifted Under Section 362(d)(2)

79.    The Secured Creditors are also entitled to have the automatic stay lifted

under section 362(d)(2).  A secured creditor seeking relief from the automatic stay under

section 362(d)(2) bears the burden of proof on one issue only:  the lack of equity in the collateral.

See 11 U.S.C. § 362(g)(l); see also Timbers II, 484 U.S. at 375; In re Bowman, 253 B.R. 233,

---

[6]    Courts have recognized that the legislative history of Bankruptcy Code section 362(d) evidences congressional intent to find the requisite "cause" where necessary to allow litigation involving a debtor to continue in appropriate circumstances.  See, e.g., In re Blan, 237 B.R. 737 (8th Cir. BAP 1999) (citing H.R. Rep. Nov. 95-595, at 341 (1977) and S. Rep. No. 95-989, at 50 (1978)).

[7]    Once a movant makes a *prima facie* case that cause exists to lift the stay, the burden shifts to the debtor to show that the movant's collateral is not declining in value or that the movant is otherwise adequately protected. See Harper, 2002 WL 32114481, at *3; see also In re Rogers, 239 B.R. 883, 887 (Bankr. E.D. Tex. 1999).  See, 11 U.S.C. § 362(d)(1); In re Sullivan Central Plaza I, Ltd., 935 F.2d 723, 726 (5th Cir. 1991) (affirming grant of relief from stay and vacating temporary restraining order in order for mortgagee to foreclose on collateral);

238 (8th Cir. BAP 2000).  The debtor bears the burden on whether the property is necessary for an effective reorganization.  See 11 U.S.C. § 362(g)(2).  Once the lack of equity in the property is established, the burden shifts to the debtor to demonstrate that the property is necessary to an effective reorganization.  See Timbers II, 484 U.S. at 375-736; Bowman, 253 B.R. at 238.  If a debtor is unable to carry its burden, relief from the automatic stay must be granted.  See Bowman, 253 B.R. at 238.  Where a debtor fails to establish a reasonable prospect for a successful reorganization, relief from the automatic stay is appropriate.  See id.; see also In re Sutton, 904 F.2d 327, 331 (5th Cir. 1990) (concluding debtor cannot file bankruptcy to stop foreclosure and wait for more favorable conditions).

80.    In this case, the Debtor's clearly demonstrated inability to (a) satisfy a multitude of debts – both secured and unsecured, (b) run on a cash flow positive basis for any period of time, and (c) sell the Company assets for a value sufficient to repay the obligations secured thereby conclusively demonstrates (among other reasons) that the Debtor has no equity in the Collateral.  Put another way, the Debtor cannot demonstrate any equity in the Collateral when it has been able to survive only due to continued additional borrowings from the Secured Lenders extended to the Company despite continued multiple defaults.

81.    For all of the foregoing reasons, the Secured Lenders have satisfied their burden of proving that the Debtor lacks equity in the Collateral.  As such, the burden shifts to the Debtor to demonstrate that the Collateral is necessary to an effective reorganization, a burden the Debtor simply cannot meet.

82.    To prevail against a secured creditor who has moved to lift the stay under section 362(d)(2) of the Bankruptcy Code, a debtor must do more than show high hopes; instead, it must be able to show a reasonable prospect for a successful standalone reorganization within a

reasonable time.  See Timbers I, 808 F.2d at 370.  A standalone reorganization must be realistically possible.  See, e.g., Albany Partners, Ltd. v. U.P Liestbruck (In re Albany Partners, Inc.), 749 F.2d 670, 673 n.7 (8th Cir. 1984); Harper, 2002 WL 32114481, at *3 (debtor must show that there is a reasonable possibility of a successful reorganization within a reasonable time).

83.     The Debtor is not now, nor, in recent times, has it been, a viable, profitable business and it has no practical business plan or another exit strategy.  See In re Adbrite Corp., 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003) ("The debtor … should not continue in control of the business beyond a point at which reorganization no longer remains realistic").  As detailed at length above, an effective reorganization is clearly not realistic, possible or feasible, and the Debtors are unable to meet their burden.

## III.    Appointment of Chapter 11 Trustee is Appropriate to Replace Board and Management

84.     As a further alternative, if the Court is not willing to either convert or dismiss the case or to modify the automatic stay to allow the Secured Creditors to proceed with the Foreclosure Action, the Secured Creditors respectfully request that a chapter 11 be appointed in this case.

### A.     Legal Standards Governing Appointment Of Chapter 11 Trustee

85.     Bankruptcy courts will leave a debtor in possession of its assets and business only where current management "can be depended upon to carry out the fiduciary responsibilities of a trustee."  See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985).  When the current management is incapable of performing these duties, or when creditors' confidence in such management evaporates, a chapter 11 trustee must be appointed.  See In re McCorhill Publ'g, Inc., 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987); In re

Marvel Entm't Group, Inc., 140 F.3d 463, 473 (3d Cir. 1998).  "[T]he appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served."  In re SunCruz Casinos, LLC, 298 B.R. 821, 828 (Bankr. S.D. Fla. 2003) (quoting In re Intercat, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000)); see also In re V. Savino Oil & Heating Co., 99 B.R. 518, 525-26 (Bankr. E.D.N.Y. 1989) ("Section 1104(a) represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession").

86.      The Bankruptcy Code provides for the appointment of a chapter 11 trustee on two alternative grounds, both of which are present here.  Section 1104(a)(l) provides for the appointment of a trustee for "cause."  See 11 U.S.C. § 1104(a)(l).  "Cause" is defined to include "fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case."  Furthermore, even where "cause" is not established, section 1104(a)(2) provides for the appointment of a trustee "if such appointment is in the interests of creditors . . . and other interests of the estate".  See 11 U.S.C. §1104(a)(2).

87.      As explained herein, not only does ample "cause" exist here to appoint a trustee, but the appointment of a trustee will also serve the interests of all parties in interest by resulting in a more efficient and less contentious proceeding.  Therefore, appointment of a chapter 11 trustee is warranted in these cases under both sections 1104(a)(l) or 1104(a)(2).

**B.      Abundant "Cause" Exists For Appointment Of Chapter 11 Trustee**

88.      Section 1104(a)(l) of the Bankruptcy Code provides, in pertinent part, that the court shall order the appointment of a trustee:

for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, **either before or after the commencement of the case**, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

See 11 U.S.C. § 1104(a)(l) (emphasis added).[8]  See also 11 U.S.C. §1104(e) (requiring the U.S. trustee to move for appointment of a trustee under subsection (a) of section 1104 if "there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive or chief financial officer . . . participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor").

89.     As stated in section 1104(a)(1), prepetition conduct alone is sufficient to warrant the appointment of a trustee.  See also In re Rivermeadows Assocs., Ltd., 185 B.R. 615, 619 (Bankr.  D. Wyo. 1995) ("the Code is clear that the prepetition conduct of the debtor's management may be the sole deciding factor" in the appointment of a chapter 11 trustee); Savino Oil, 99 B.R. at 526 ("prepetition course of conduct, in and of itself, constitutes 'cause' for the appointment of a Chapter 11 trustee.").  Accordingly, a party seeking appointment of a trustee need not, and should not, delay filing a motion for such relief until after the debtor has had an opportunity prove its unsuitability as debtor in possession.  See In re Colorado-Ute Elec. Ass'n, Inc., 120 B.R. 164, 175 (Bankr. D. Colo.  1990) ("if the facts and circumstances warrant the appointment of a trustee, it is not appropriate to wait to file the motion . . . . Such a deferral will

---

[8]     Courts have historically required cause to be established by "clear and convincing evidence." However, recent authority, citing the Supreme Court's 1991 decision in Grogan v. Garner, 498 U.S. 279, 286-91 (1991) establishes a "preponderance of the evidence" as the general level of proof required in bankruptcy cases.  See Tradex Corp. v. Morse, 339 B.R. 823, 831-32 (D. Mass. 2006) (rejecting clear and convincing evidentiary standard in context of a motion to appoint a trustee in favor of following the Grogan rationale that a heightened standard of review should not be applied when "Congress has not explicitly adopted a standard different from the traditional preponderance standard"); see also In re Altman, 230 B.R. 6, 16-17 (Bankr. D. Conn. 1999) (same), vacated in part on other grounds, 254 B.R. 509 (D. Conn. 2000). The distinction here is immaterial since the evidence presented satisfies the higher standard. See, e.g., Crescive Landscape Mgmt. v. PHDC, LLC (In re PHDC, LLC), 2004 Bankr. LEXIS 1113, at *6-*7 (Bankr. N.D. Ga. Apr. 28, 2004).

only further delay the progress toward the effective rehabilitation and reorganization of the debtor").

90.     While section 1104(a)(l) expressly identifies four bases upon which "cause" may be found – fraud, dishonesty, incompetence and gross mismanagement – these enumerated grounds are not exclusive, and additional grounds may be available.  See, e.g., Savino Oil, 99 B.R. at 525; In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989). Importantly, once a court finds that "cause" exists, a trustee must be appointed, the court has no discretion to deny the requested relief.  See Savino Oil. 99 B.R. at 525; In re Deena Packaging Indus., Inc., 29 B.R. 705, 706 (Bankr.  S.D.N.Y. 1983).

### 1.     "Cause" To Appoint Trustee Exists Due To Incompetence And Gross Mismanagement Of Current Management

91.     "In the usual chapter 11 proceeding, the debtor remains in possession throughout the reorganization because current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate."  Marvel, 140 F.3d at 471 (internal quotations omitted).  However, where, as here, the current management is incompetent or is otherwise guilty of grossly mismanaging the Debtors' affairs, this rationale is absent.  It is beyond dispute that these Debtors will only be disadvantaged in their efforts to act for the benefit of all of the stakeholders by the continued overhang of the Board's incompetence and gross mismanagement.

92.     There is no doubt that the Debtor's current management is not suited to carry out the fiduciary responsibilities of a trustee.  As described above, the chairperson of the Board has repeatedly threatened to allow the Company's stations to "go dark" and to resign and walk away rather than seek bankruptcy protection for the Company.  The management refused to prepare for an orderly bankruptcy filing and/or restructuring process and repeatedly refused

reasonable proposals from the Secured Lenders, including their offers of debtor-in-possession

financing.  On numerous occasions, the Secured Lenders offered the Debtor additional

borrowing capacity to be used to hire competent restructuring counsel that would be able to

advise the Debtor.  Those offers were ignored. As a result, by filing a bankruptcy petition for the

Debtor, while leaving all of the Subsidiaries without the bankruptcy protection, the Board only

further jeopardized the Company's value, thus yet again proving its complete incompetence and

inability to plan ahead.

### 2.   "Cause" Exists for Appointment Of A Trustee Due To Fraud And Dishonesty Of Current Management

93.     As described above, the Debtor's history is rife with acts of plain

dishonesty and outright fraud – from perjurious sworn statements to the FCC to repeatedly

making commitments to lenders and other creditors that the Debtor had no ability and/or

intention to keep.  Such conduct clearly qualifies as sufficient cause for the appointment of a

trustee.  In addition, the history of the Debtor's actions with the Senior Lenders and other parties

in interest indicates a clear disregard for the full disclosure policy that forms the backbone of the

bankruptcy process.  See, e.g., In re XI0 Wireless Tech., Inc.,  2004 WL 3131910

(Bankr.W.D.Wash. Nov. 10, 2004) (ruling that debtor's established dishonesty in producing

falsified documents in a state court proceeding mandated appointment of a trustee); Tradex Corp.

v. Morse, 339 B.R. 823, 834 (D. Mass. 2006) (where debtor fails to disclose material and

relevant information to the court and creditors, appointment of a trustee is required); Savino Oil,

99 B.R. at 525-526 (noting that "honest and straightforward disclosure ... is intrinsic to the entire

reorganization process" and that debtor's failure to disclose relevant information regarding its

business and customers, as well as its affirmative efforts to misrepresent or conceal such

important matters warranted appointment of a trustee); Marvel, 140 F.3d at 474 (failure to make

"open, honest and straightforward disclosure to the Court and creditors" falls short of complying with fiduciary obligations).[9]

94.    Courts have also frequently held that diversion or misuse of corporate assets constitutes grounds for appointment of a trustee.  See, e.g., Sharon Steel, 871 F.2d at 1228 (affirming bankruptcy court's appointment of a trustee where the debtors' management, in systematically siphoning assets to other companies under common control on the eve of bankruptcy, "raise[d] grave questions about current management's ability to fulfill its fiduciary duty as debtor-in-possession to [the debtors'] creditors"); In re PRS Ins. Group, 274 B.R. 381, 387-88 (Bankr. D. Del. 2001) (debtor's failure to satisfactorily explain alleged diversion of assets from debtor's subsidiary to its president and sole shareholder and misuse of corporate assets, including for the personal expenses of the president, constituted grounds for appointment of a trustee).[10]  In complete disregard for his fiduciary obligations to the Debtor, Morton has overseen, facilitated and participated in numerous schemes to loot assets from the Debtor.

95.    Morton's previous self-dealing in misappropriating for himself the intellectual property pertaining to RTN, placing his family members on the corporate payroll and

---

[9]    Also instructive in this regard is In re The 1031 Tax Group, LLC, 374 B.R. 78, 87-88 (Bankr. S.D.N.Y. 2007).  The 1031 Tax Group court focused on new Section 1104(e) (added to the Bankruptcy Code in connection with the 2005 amendments), which requires the U.S. Trustee to move for appointment of a trustee if there are reasonable grounds to suspect that current members of the debtor's governing body or the governing body who selected debtor's management participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor.  See id.; 11 U.S.C. § 1104(e).  In interpreting that provision, the court noted that where "a tainted current member of the [debtor's] governing body has selected or appointed new management shortly before or after a Chapter 11 filing, a court should apply heightened scrutiny in reviewing whether new management is also tainted, thereby requiring appointment of a Chapter 11 trustee for 'cause.'"  See 1031 Tax Group, 374 B.R. at 87-88.  In such a situation, the party opposing appointment of a trustee would have the burden of demonstrating "that the new management is unconflicted by any association with the tainted members of the governing body that made the selection or appointment."  See id.  Morton is unable to satisfy this heightened scrutiny.

[10]    See also Intercat, 247 B.R. at 915-20 (appointing a chapter 11 trustee; diversion of substantial corporate assets to the debtor's management or to other corporations owned by management constituted mismanagement at best and fraud or dishonesty at worst); In re McCorhill Publ'g. Inc., 73 B.R. at 1017 ("where there are questionable inter- company financial transfers and the principals of the debtor occupy conflicting positions in the transferee companies, a trustee should be appointed").

using corporate cash and assets for his personal benefit clearly demonstrates the level of respect that Morton accords his fiduciary duties and shows that he is clearly conflicted and incapable of fulfilling his fiduciary duties to all of the Debtor's stakeholders.  In addition, Morton's recent lawsuit seeking damages from the Company for its inability to make payments to him under various contracts, further adds to the conflicts of interests that makes him unfit to manage the Debtor.  Numerous courts have found  such a situation to constitute sufficient "cause" for the appointment of a trustee.  See, e.g., SunCruz Casinos, 298 B.R. at 830 (conflicting interests rendered management unable to fulfill its fiduciary duties as debtor-in-possession); In re Fiesta Homes of Georgia, 125 B.R. 321, 325-26 (Bankr. S.D. Ga. 1990) ("the presence of a conflict of interest constitutes cause for removal of the Debtor-in-possession from administration of this case."); In re Nautilus of New Mexico, Inc., 83 B.R. 784, 789 (Bankr. D.N.M. 1988) (where individual who controlled debtor-in-possession had conflicts with interests of the estate, trustee was warranted); Cajun Elec. Power Coop, v. Central La. Elec. Coop (In re Caiun Elec. Power Coop., Inc.), 74 F.3d 599, 600 (5th Cir. 1995) (adopting on rehearing the dissent in 69 F.3d 746, 751 (5th Cir. 1995)) (recognizing that the "inherent conflict" caused by debtors' (a utility cooperative) board members being managers or members of the debtor's individual utility companies was sufficient by itself for the appointment of a trustee).  Given Morton's considerable conflicts of interest, he is simply incapable of satisfying his fiduciary duties to the Debtor's estate and creditors.  Similarly, that the Board has brought back Morton to run the business evidences their inability to act as fiduciaries.  Therefore, there is cause to appoint a trustee in this case.

> 3.   **"Cause" Exists For Appointment Of Trustee Due To Debtors'
> Potential Causes Of Action Against Management**

96.     Also strongly militating in favor of the appointment of a trustee is the fact that Morton and certain other members of the Board are possible targets of estate causes of action, including, *inter alia*, claims for breach of fiduciary duty, corporate waste, and fraudulent and other avoidable transfers.  Given Morton's and the Board's conflicted positions *vis-a-vis* these potentially value-accretive claims, it can hardly be expected that they will support (or even grudgingly tolerate) their prosecution.  Courts routinely have held that management's position as a potential target of estate causes of action constitutes grounds for appointment of a trustee.  See, e.g., Sharon Steel, 871 F.2d at 1220-21 (current management was unable to fulfill its fiduciary duty to pursue prepetition voidable transfer causes of action because the debtor corporation and the recipient corporations had common management and those managers had conflicting duties to the debtor and to the recipients of the voidable payments); PRS Ins. Group, 274 B.R. at 387-88 (where there was evidence of significant transfers of assets to the debtor's president and sole shareholder, current management was unable to investigate and prosecute the potential causes of action and grounds existed for the appointment of a trustee).

### 4.     "Cause" Exists For Appointment Of Trustee Due To Acrimony Between Debtors and Creditors

97.     The Board's ill-designed responses to the crises caused by their own mismanagement and misconduct have created and continue to deepen and exacerbate the acrimony and distrust between the Debtor and its creditors.  The Board has repeatedly rejected the Secured Lenders' offers to negotiate a potential DIP financing and have instead elected to engage in threats of wasteful legal proceedings in an unsuccessful effort to coerce concessions from the Secured Lenders.  Similarly, the Debtor has not engaged in productive discussions with their numerous critical vendors and filed for bankruptcy only when such vendors threatened imminent termination.

98.     The acrimony between the Debtor and its constituents constitutes independent "cause" for the appointment of a trustee.  Courts have held that where acrimony or lack of cooperation exists between the debtor and creditors that extends beyond the healthy conflict that generally exists, a trustee should be appointed.  See, e.g., Marvel, 140 F.3d at 472-73.  In Marvel, the Third Circuit upheld the appointment of a trustee, finding that "deep-seeded conflict and animosity" between the debtor-in-possession and its creditors had risen to a level of "cause."  See id at 473.  The court noted that "[t]he intense and high stakes bickering between the [debtor] interests and the Lenders does not instill confidence that the [debtor] interests could fairly negotiate with the creditors to whom they owe these duties, nor that reorganization will occur effectively."  See id. at 474 (citing In re Bellevue Place Assocs., 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994) (appointment of a trustee pursuant to 11 U.S.C. § 1104(a)(l) was necessary because the case was "a large and messy bankruptcy that promises to get worse without a disinterested administrator at the helm").

### C.    Appointment Of A Trustee Is In The Interests Of The Estate And Other Parties In Interest

99.     Section 1104(a)(2) of the Bankruptcy Code provides, in pertinent part, that the court shall order the appointment of a trustee "if such appointment is in the interest of creditors . . . and other interests of the estate . . .."  11 U.S.C. §1104(a)(2).  Thus, even where no "cause" exists, section 1104(a)(2) creates a flexible standard whereby the court shall appoint a trustee when it is in the best interests of the creditors and the estate.

100.    In determining the best interests of creditors and the estate, courts "resort to [their] broad equity powers .... [e]quitable remedies are a special blend of what is necessary, what is fair and what is workable."  See In re Hotel Assocs., Inc., 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980); see also In re Wings Digital Corp., 2005 WL 3789334, at *4-5 (Bankr. S.D.N.Y.

42

May 16, 2005) (noting that section 1104(a)(2) is a "lesser standard" than section 1104(a)(l)).  In exercising their equitable powers to appoint a trustee under section 1104(a)(2), courts "eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests."  See Hotel Assocs., 3 B.R. at 345.

101.    When determining whether the appointment of a trustee is in the best interests of the creditors and the estate, courts consider many factors, including:  (i) the trustworthiness of the debtor, In re Evans, 48 B.R. 46, 48 (Bankr. W.D. Tex. 1985); (ii) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation, In re Parker Grande Dev., Inc.,  64 B.R. 557, 561 (Bankr. S.D. Ind. 1986); (iii) the confidence, or lack thereof, of the business community and of creditors in present management, In re Concord Coal Corp., 11 B.R. 552, 554 (Bankr. S.D.W.Va. 1981); and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment, Microwave Prods. of Am., 102 B.R. at 675; see also In re Sharon Steel Corp., 86 B.R. at 466 (noting that "[i]n a case of this magnitude, the cost of having a trustee in place is insignificant when compared with the other costs of administration and when compared with the enormous benefit to be achieved by the establishment of trust and confidence in ... management.").  See also In re Ionosphere Clubs. Inc., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990); In re Madison Mgmt. Group. 137 B.R. 275, 282 (Bankr. N.D. Ill. 1992).  The Secured Lenders submit that the aforesaid factors are all present in these cases and that the appointment of a trustee under section 1102(a)(2) is clearly warranted.

102.    Indeed, the need for appointment of a trustee in these proceedings is heightened due to the highly-regulated industry in which the Company operates.  The Debtor's estate should not be subjected to the continuing risk of further mismanagement by the Board and

management of critical regulatory matters where the consequences are so disastrous -- namely,

the inability to sell, transfer or renew licenses leading to further erosion of value.

## CONCLUSION

WHEREFORE, Silver Point, on behalf of the Secured Lenders, requests that the Court enter an Order (i) immediately converting this chapter 11 case to a case under chapter 7 or dismissing this case outright, or (ii) in the alternative, lifting the automatic stay to allow the Secured Lenders to proceed with the exercise of their remedies under the Credit Agreement and applicable non-bankruptcy law against the Collateral, or (iii) in the further alternative, directing the United States Trustee to immediately appoint a chapter 11 trustee, and (iv) granting the Secured Lenders such other and further relief it deems just and proper.

Dated: December 9, 2008

By: /s/ Geoffrey B. Treece
    Geoffrey B. Treece
    **QUATTLEBAUM, GROOMS, TULL &**
    **BURROW PLLC**
    111 Center Street, Suite 1900
    Little Rock, Arkansas 72201
    (501) 379-1735 (Telephone)
    (501) 379-1701 (Facsimile)
    gtreece@qgtb.com

       - and -

    **MILBANK, TWEED, HADLEY & M$^{c}$CLOY** LLP
    David S. Cohen
    Abhilash M. Raval
    Lena Mandel
    Peter K. Newman
    1 Chase Manhattan Plaza
    New York, New York 10005-1413
    (212) 530-5000 (Telephone)
    (212) 530-5219 (Facsimile)
    dcohen@milbank.com
    araval@milbank.com
    lmandel@milbank.com
    pnewman@milbank.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

```
------------------------------------------------------ X
In re:                                      :       Chapter 11
                                            :       Case No. 08-17646
                                            :
                                            :
EQUITY MEDIA HOLDINGS CORP.                 :
                                            :
:
                        Debtor.             :
------------------------------------------------------ X
```

## <u>ORDER, PURSUANT TO 11 U.S.C. § 1112(b), CONVERTING CASES TO CHAPTER 7</u>

Upon the motion (the "<u>Motion</u>")[1] of Silver Point Finance, LLC ("<u>Silver Point</u>"),

in its capacity as the Administrative Agent and Collateral Agent under that certain Third

Amended and Restated Credit Agreement, dated as of February 13, 2008 (as amended and

supplemented from time to time, the "<u>Credit Agreement</u>"), by and among Equity Media

Holdings Corporation (the "<u>Debtors</u>") and certain of its affiliates, as Borrowers, Silver Point, as

Administrative Agent and Collateral Agent, and the lenders party thereto from time to time

(together with Silver Point, the "<u>Secured Lenders</u>"), for an Order, pursuant to section 1104(a) of

title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>"),

appointing a trustee in the above-captioned cases or, in the alternative, pursuant to

section 1112(b) of the Bankruptcy Code, converting these cases to chapter 7 or dismissing these

cases, or in further alternative, lifting the automatic stay pursuant to section 362(d) of the

Bankruptcy Code, to allow the Secured Lenders to exercise remedies available to them under the

Credit Agreement and applicable non-bankruptcy law, as more fully set forth in the Motion; and

this Court possessing jurisdiction to consider the Motion; and venue in this district being proper;

---

[1]     Capitalized terms not otherwise defined herein shall have the respective meanings ascribed to them in the
Motion.

and it appearing that the relief requested by the Motion is necessary and in the best interests of the estates, their creditors, and all parties in interest; and due and proper notice of the Motion having been given; and it appearing that no other or further notice need be given; and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted, and it is further

ORDERED that the above-captioned chapter 11 cases are converted to cases under chapter 7 of the Bankruptcy Code; and it is further

ORDERED that the chapter 7 trustee is authorized and directed to operate the Debtor's business; and it is further

ORDERED, that the debtor in possession shall forthwith turn over to the chapter 7 trustee all records and property of the estate under its custody or control as required by Federal Rule of Bankruptcy Procedure 1019(4); and it is further

ORDERED that this Court shall retain jurisdiction to consider all matters arising from the interpretation or implementation of this Order.

Dated: _____, 2008

_____
UNITED STATES BANKRUPTCY JUDGE